**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT<br>OPERATING COMPANY, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 15-03193 (ABG) |

**NOTICE OF MOTION AND PETITIONING CREDITORS'**
**MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

    **PLEASE TAKE NOTICE** that on May 14, 2015, Appaloosa Investment Limited Partnership I, OCM Opportunities Fund VI, L.P. and Special Value Expansion Fund, LLC (collectively, the "Petitioning Creditors") filed the *Petitioning Creditors' Motion to Compel Production of Documents* (the "Motion").

    **PLEASE TAKE FURTHER NOTICE** that on **May 20, 2015, at 9:30 a.m. (prevailing Central Time)** or as soon thereafter as counsel may be heard, the Petitioning Creditors will appear before the Honorable A. Benjamin Goldgar, or any other judge who may be sitting in his place and stead, in Courtroom 2525 in the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604, and present the Motion.[2]

    **PLEASE TAKE FURTHER NOTICE** that copies of the Motion, as well as copies of all documents filed in this chapter 11 case, are available free of charge by visiting the case website maintained by Prime Clerk LLC, the claims and noticing agent for this chapter 11 case, available at https://cases.primeclerk.com/CEOC or by calling (855) 842-4123 within the United States or Canada or, outside of the United States or Canada, by calling +1 (646) 795-6969. You may also obtain copies of any pleadings by visiting the Court's website at ww.ilnb.uscourts.gov in accordance with the procedures and fees set forth therein.

---

[1] The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623.

[2] The Debtor has requested that the Petitioning Creditors agree to a briefing and hearing schedule under which the Debtor would have one week to file an opposition memorandum, with the hearing held on May 27, 2015 at 1:30 p.m., the scheduled omnibus hearing date and time for CEOC's voluntary bankruptcy proceeding. The Petitioning Creditors have advised the Debtor that they are willing to agree to that proposal, subject to the agreement of the Debtor to produce any responsive documents (including those compelled by this Court) no later than June 10, 2015, and to file its opposition memorandum no later than 4:00 p.m. central time on the due date (which would be May 21, 2015).

Dated:  May 14, 2015

Respectfully submitted,

/s/*Timothy W. Hoffmann*
Timothy W. Hoffmann (No. 6289756)
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
Telephone:   (312) 782-3939
Facsimile:    (312) 782-8585
thoffmann@jonesday.com

-and-

Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
JONES DAY
555 South Flower Street
50th Floor
Los Angeles, California  90071
Telephone:   (213) 489-3939
Facsimile:    (213) 243-2539

Counsel for Appaloosa Investment Limited Partnership I, OCM Opportunities Fund VI, L.P. and Special Value Expansion Fund, LLC

2

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT<br>OPERATING COMPANY, INC.,[3]<br><br>Debtor. | Chapter 11<br><br>Case No. 15-03193 (ABG) |

**PETITIONING CREDITORS' MOTION TO
COMPEL PRODUCTION OF DOCUMENTS**

Appaloosa Investment Limited Partnership I, OCM Opportunities Fund VI, L.P. and Special Value Expansion Fund, LLC (collectively, the "Petitioning Creditors"), move to compel production of documents by Caesars Entertainment Operating Company, Inc. ("CEOC" or the "Debtor") pursuant to Rules 7026 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 26 of the Federal Rules of Civil Procedure (the "Federal Rules"), and Rule 7026-1 of this Court's Local Rules.  A proposed form of order is attached as Exhibit A.

**PRELIMINARY STATEMENT**

1.      The Debtor has refused to produce the following documents requested by the Petitioning Creditors:  (1) copies of  invoices, requests for payment, purchase orders, payment demands, and other documents evidencing or otherwise relating to payment or nonpayment of debts, on the ground that such production would be unduly burdensome; (2) documents aimed at establishing the context for any non-payments of debt by the Debtor, including the missed payments to the Second Priority Noteholders and the Hilton Hotels Retirement Plan ("Hilton"), on relevance grounds; and (3) a privilege log for any documents withheld on a claim of privilege.

---

[3]    The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623.

For the reasons set forth below, the Court should compel the Debtor to produce these documents.

## BACKGROUND

2.    On January 12, 2015, the Petitioning Creditors commenced this case by filing an involuntary bankruptcy petition against the Debtor in the United States Bankruptcy Court for the District of Delaware under 11 U.S.C. § 303.  Three days later, on January 15, 2015, the Debtor filed a voluntary bankruptcy petition in this Court under 11 U.S.C. § 301.

3.    At a hearing on March 25, 2015, this Court identified two discrete issues to be adjudicated during a trial on the involuntary petition, one under 11 U.S.C. § 303(b) and the other under 11 U.S.C. § 303(h): "Whether the petitioning creditors are eligible to file the petition, and whether the debtor in question is paying its debts as they become due." Declaration of Sidney P. Levinson ("Levinson Decl."), Ex. A, at 120:10-17.  With respect to the second issue, there was further discussion regarding the four factor test applied in *In re Reed*, 11 B.R. 755, 760 (Bankr. S.D. W. Va. 1981), and in particular, the fourth factor under which the "number, amount, and materiality of non-payment must be viewed in the context of the debtor's overall handling of its financial affairs." *Id*.  As stated by this Court at a subsequent hearing on April 8, 2015, such "context" may be relevant in showing "the particular debts that were not paid, and the extent to which those debts are significant for this business, and how large they are, and how long they have been delinquent and so on . . . ." Levinson Decl., Ex. B, at 56:8-15.

4.    On April 2, 2015, the Petitioning Creditors issued to the Debtor requests to produce documents (the "Requests").  Levinson Decl., Ex. C.  Notably, the requests did not seek documents with respect to the so-called "Challenged Transactions."[4]  Instead, the requests were

---

[4]    The Petitioning Creditors believe the mere fact that such transactions occurred shows that the Debtor has been engaging in asset-liquidating transactions and has not been operating its business in the ordinary course for some time.  On April 2, 2015, the Petitioning Creditors sent proposed stipulations of fact as to those transactions.  As of today, the Debtor has not responded to those proposed stipulations.  Levinson Decl., ¶ 3.

2

focused on the issues the Court highlighted as relevant. On May 4, 2015, the Debtor issued its responses and objections (the "Objections"), Levinson Decl., Ex. D, in which the Debtor refused to produce a substantial portion of the documents that have been requested by the Petitioning Creditors, notwithstanding their clear relevance to the trial on the involuntary petition. Thereafter, the parties engaged in efforts initiated by the Petitioning Creditors to meet and confer, including two telephone calls, one on May 7, 2015 and the other on May 11, 2015, as well as an exchange of letters. Levinson Decl., ¶¶ 5-6 & Exs. E-H. Certain disputes were resolved, but others remain and are described below.

5. The disputes fall into three general categories: (a) the Debtor's refusal to produce invoices and other source documents that directly evidence the terms and payment (or non-payment) of CEOC's debts, *i.e.*, those that the Petitioning Creditors allege CEOC was generally not paying as such debts became due (Request Nos. 8-12, 15 and 27); (b) the Debtor's refusal to produce documents that show the "context" of CEOC's non-payment of certain debts (Request Nos. 16-21 and 23); and (c) the Debtor's refusal to provide a privilege log (Request No. 28).

## ARGUMENT

I. **THE COURT SHOULD COMPEL THE DEBTOR TO PRODUCE INVOICES AND OTHER UNDERLYING SOURCE DOCUMENTS TO THE PETITIONING CREDITORS**

    6. The Petitioning Creditors document requests included the following:

**Document Request No. 8.** Documents sufficient to identify each Claim paid by CEOC on or after the applicable due date for the 180 days preceding the Petition Date, including invoices evidencing payment due dates and the date that payment was actually made.

**Document Request No. 9.** All Documents evidencing any invoice, request for payment, purchase order, or other payment demand received by CEOC within 90 days of the Petition Date.

**Document Request No. 10.** All Documents evidencing any payment, in any form, made by CEOC to any Person within 90 days of the Petition Date, including

3

> without limitation copies of checks, confirmations of wire transfers, records of automated clearing house transfer, or other forms of transfers.
>
> **Document Request No. 11.** All Documents referring to any delinquent or late payments by CEOC within 90 days of the Petition Date.
>
> **Document Request No. 12.** All Documents evidencing any invoice, request for payment, purchase order, or other payment demand received by CEOC, whether or not received within 90 days of the Petition Date, that remained unpaid as of the Petition Date.
>
> **Document Request No. 27.** All Documents that CEOC would rely upon to show, or that refute, undermine, or invalidate any assertion by CEOC, that prior to the Petition Date, CEOC was generally paying its debts as they became due and/or that CEOC was operating its business in the ordinary course and in good faith.

Levinson Decl., Ex. C.

7. The Debtor objected to each of those requests. Levinson Decl., Ex. D. For example, the Debtor objected to Request No. 8 "to the extent it seeks invoices evidencing payment due dates and the date that payment was actually made, on the grounds that such request is unduly burdensome, and the information can be provided in a less burdensome form." *Id.* at 9. Rather than the actual invoices requested by the Petitioning Creditors, the Debtor stated that it would produce only "documents sufficient to identify debts paid by CEOC on or after the stated due date for the 180 days preceding the Petition Date, the date such debt was due, and the date that payment was made."[5] *Id.* As made clear in the objections to the other requests listed above and the efforts to meet and confer, the Debtor has taken the position that it would be unduly burdensome to produce invoices or other source documents evidencing the debts. *See* Levinson Decl., Exs. D, E and F.

8. Where a party claims that compliance with a discovery request creates an undue burden, the party must do more than merely generally assert hardship; it must "specifically

---

[5] The Debtor lodged the same objection to Request Nos. 8-12 and 27. The Petitioning Creditors believe that invoices and other source documents must be produced for each of these requests, for the reasons explained herein.

4

demonstrate the burden discovery would impose." *Symons Int'l Grp., Inc v. Cont'l Cas. Co.*, No. 1:01-CV-00799-RLY-MJ, 2015 WL 1279839, at *7 (S.D. Ind. Mar. 20, 2015) (internal citations omitted). The Debtor has made no such showing, nor can it do so. Courts deciding whether to limit discovery as unduly burdensome evaluate whether the burden of the discovery outweighs the likely benefit. In making this assessment, courts apply the "proportionality test" under Fed. R. Civ. P. 26(b)(2)(C)(iii), which analyzes: (i) the needs of the case; (ii) the amount in controversy; (iii) the resources of the parties; (iv) the importance of the issues at stake in the litigation; and (v) the importance of the proposed discovery in resolving the issues. *See In re Mosher*, No. 06-B-71261, 2009 WL 412692, at *2 (Bankr. N.D. Ill. Feb. 11, 2009).

9. Here, the "needs of the case," the "importance of the issues at stake in the litigation," and "the importance of the proposed discovery in resolving the issues" all weigh heavily in favor of requiring the Debtor to provide invoices and other source documents. Indeed, "invoices evidencing payment due dates and the date that payment was actually made" are not just *some* evidence of whether the Debtor was paying its debts as they came due; they are *the* evidence of whether, as of January 12, 2015, the Debtor was "generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h). Courts applying this standard have focused on, among other issues, the number, amount, materiality and context of any unpaid debt, including the period of time that such debt was overdue. The most probative and accurate evidence regarding these issues are the actual invoices, requests for payment, purchase orders, agreements, and other payment demands received by the Debtor and evidencing any payment made by the Debtor.

10. Not surprisingly, courts addressing whether an involuntary debtor was generally paying its debts as they come due, and whether such debts involve bona fide disputes, have

5

involved evaluation of the bills and invoices themselves. *E.g.*, *In re Kreidler Import Corp.*, 4 B.R. 256, 260-62 (Bankr. D. Md. 1980)(court applying section 303(h) considered payment demands and invoices in determining whether debt was past due); *In re Whiteside*, 238 B.R. 468, 471 (Bankr. W.D. Mo. 1999) (holding that the petitioning creditors could not establish that they met the requirements of Section 303(h) where they "did not adduce one piece of concrete evidence that [the alleged debtor] wasn't paying his debts as they became due, such as an actual bill, a letter from a creditor demanding payment, a lawsuit, or proof of an obligation with date certain that had not been paid"); *see also In re Wishgard, LLC*, No. 13-20613-CMB, 2013 WL 1774707 (Bankr. W.D. Pa. Apr. 25, 2013) (evaluating invoices to determine whether *bona fide* dispute to eligibility of claim existed under section 303(b)); *In re Green*, No. 06-11762-FM, 2007 WL 1093791, at *9-11 (Bankr. W.D. Tex. Apr. 9, 2007)(same).

11.    Courts in other contexts have rejected claims that production of invoices would be unduly burdensome. *See, e.g., Crable v. State Farm Mut. Auto Ins. Co.*, No. 5:10-cv-402-OC-37TBS, 2011 WL 5525361, at *7 (M.D. Fla. Nov. 14, 2011) (requiring production of invoices and noting that "they may go to the heart of the truth seeking function and fairness of the trial of this lawsuit"); *National Surety Corp. v. Dustex Corp., et al.*, No. C13-2004, 2014 WL 46541, at *2 (N.D. Iowa Jan. 6, 2014) (finding it "difficult to believe that accessing invoices submitted by an attorney to a client is a difficult or burdensome process"); *Aho v. AmeriCredit Fin. Servs., Inc.*, No. 10cv1373-DMS(BLM), 2012 WL 124794, at *6 (S.D. Cal. Jan. 13, 2012) ("Although producing the requested invoices may be a substantial undertaking, the Court finds that any concomitant burden or expense does not outweigh the likely benefits of production."). This Court should conclude the same, particularly where, as here, the relevance of the invoices and other source documents far outweighs any burden to the Debtor in producing them. In large part,

this is because the involuntary petition was filed against only CEOC itself, which is mainly a holding company. This fact alone reduces significantly the number of debts to be examined. Indeed, there appear to be fewer than 600 trade creditors listed in Schedule F-7 of CEOC's Schedules of Assets and Liabilities. (ECF No. 882, at 123-181 of 776).

12. The substitutes offered by CEOC in lieu of the actual documents evidencing the payment or nonpayment of debts are wholly inadequate. For example, the Petitioning Creditors should not be required to rely on summary documents specially manufactured by CEOC and its lawyers for this proceeding.[6] Indeed, while Federal Rule of Evidence 1006 contemplates the use of summary exhibits at trial when the underlying documents are voluminous, Rule 1006 also requires the proponent of the summary chart to make the underlying information available to the other parties. The same rule should apply to pre-trial discovery. *E.g., Kehoe Component Sales, Inc. v. Best Lighting Prods., Inc.*, No. 2:08-CV-752, 2010 WL 596501, at *4 (S.D. Ohio Feb. 16, 2010); *Fellowes Inc. v. Aurora Corp. of America*, No. 07 C 7237, 2009 WL 1097063, at * 5 (N.D. Ill. Apr. 1, 2009)(rejecting defendants' argument that audited financial statements were sufficient and ordering production of the "underlying financial data" sought by plaintiffs). As stated by the court in *Kehoe Component*, citing *Fellowes*, "[i]f the evidence rules themselves reflect the lack of trustworthiness of summaries of undisclosed documents, it would seem unwarranted to prevent a party-opponent in litigation from discovering the same type of information in order to verify that the summaries are accurate." *Id.* (internal citations omitted).

13. Nor should the Petitioning Creditors be required, as the Debtor proposes, to rely solely on aging reports taken from the Debtor's books and records, which may be based on

---

[6] Making matters worse, the Debtor proposes to base those summary documents on the wrong "Petition Date," using the filing date of CEOC's voluntary bankruptcy case (January 15, 2015) rather than the Petitioning Creditors' involuntary filing date (January 12, 2015). Levinson Decl., Ex. D, at 3, ¶ 8, Ex. E.

7

inputs, assumptions, or methodologies that do not accurately reflect the invoices and underlying documents or provide all of the information required to assess whether debts have been paid when due. The Debtor's own schedules of assets and liabilities contain eight full pages of single spaced, small font "GLOBAL NOTES AND STATEMENT OF LIMITATIONS, METHODOLOGY, AND DISCLAIMER REGARDING DEBTOR'S SCHEDULES AND STATEMENTS." (Case No. 15-01145, ECF No. 882, at 3-10 of 776). According to that "statement": (a) the actual totals of the amounts shown in the schedules, which are based on "known" amounts included in the Debtor's books and records, "may be different than the listed total, and the difference may be material" (ECF No. 882, at page 3 of 776); (b) in certain instances, "the date on which a Claim arose is an open issue of fact" (ECF No. 882, at 7 of 776); and (c) the claims of individual creditors for goods and services "are listed as either the lower of the amounts invoiced by such creditor or the amounts entered on the Debtors' books and records" (ECF No. 882, at 7 of 776). These disclaimers suggest that the invoices do not always match the Debtor's books and records and that the Debtors summaries are neither reliable nor admissible evidence.

14.    There are other reasons to question the reliability of any summaries generated by the Debtor's lawyers or maintained by the Debtor. For example, the Debtor and its counsel seem to contend that the interest payment that was due on December 15, 2014 under the Second Priority Notes was somehow not due on that date, based on an alleged 30-day "grace period" that, in fact, only applies to acceleration of the principal balance of the notes, and not the due date of the interest payment. Based on the Debtor's interpretation, it is conceivable that the Debtor's books and records would show that the interest was not due until January 14, 2015, even though the underlying agreements show a due date of December 15, 2014. The Petitioning

8

Creditors need access to the source documents to make an independent assessment as to each of the paid and unpaid debts of CEOC.

15. Finally, the Petitioning Creditors should not be limited to receiving a sample of the source documents, as proposed in the objections and during the meet and confer process. In its objection to Request No. 15,[7] the Debtor proposed to limit production of source documents to debts that exceed $50,000 or are overdue by more than thirty days. The dollar threshold would eliminate all but 24 of the trade claims listed on the Debtor's schedules, making it impossible to evaluate the bulk of the trade claims. Likewise, the overdue threshold proposed by CEOC would eliminate many unpaid debts that are past due and thus should be included as late in calculating the number and amount of overdue debts.

16. Given the centrality of the source documents to the issue in this case, the absence of any specific showing of undue burden by the Debtor pursuant to Rule 26(b)(2)(C), and the lack of reliability or sufficiency of the substitutes offered by the Debtor, this Court should order production of the documents responsive to Request Nos. 8-12, 15 and 27.[8]

## II. THE COURT SHOULD COMPEL THE DEBTOR TO PRODUCE INFORMATION REGARDING THE CONDUCT OF ITS AFFAIRS PRIOR TO BANKRUPTCY

---

[7] Request No. 15 seeks "All Documents Regarding any basis, reason or justification that supports CEOC's failure to pay any claim on or before the date that it became due that remained unpaid on the Petition Date." Levinson Decl., Ex. C, at 10.

[8] In their document requests, the Petitioning Creditors also requested "[a]ll Documents Regarding any Claims, payment demands, or requests for payment made against CEOC by, or on behalf of, Hilton Hotels Retirement Plan," as well as any "analysis, evaluation, or assessment of any Claims" and "[a]ll Documents Regarding whether CEOC should make any payments on any Claims" by Hilton. *See* Levinson Decl., Ex. C, at 11. The Debtor has stated that it will produce all correspondence and underlying agreements with Hilton regarding these debts, along with non-privileged accounting memos. Levinson Decl., Exs. E, F. Provided that such documents include any invoices or demands for payment, as well as any evidence of payment to Hilton, the Petitioning Creditors will not insist upon a further production. However, to the extent the Debtor refuses to provide source documents for the Hilton debts, the Petitioning Creditors request that the Court also compel production of such documents.

17. The Debtor also has objected to the Petitioning Creditors' request for documents aimed at establishing a context for the Debtor's missed payments (Request Nos. 16-19, 21, 23) on the ground that such information is not relevant. These objections are also unfounded.

18. Pursuant to Bankruptcy Rule 7026, a party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Bankr. P. 7026(b)(1); Fed. R. Civ. P. 26(b)(1).

19. In applying the "generally not paying debts" standard under section 303(h), courts consider (1) the number of claims that the debtor has not paid; (2) the amounts of these unpaid claims; (3) the materiality of the non-payments; and (4) the debtor's overall financial condition and affairs. *In re Paper I Partners, L.P.*, 283 B.R. 661, 677 (Bankr. S.D.N.Y. 2002); *see also* Collier on Bankruptcy ¶ 303.31[2]. "No one factor is necessarily determinative of whether in fact the debtor is generally not paying debts as they come due," and thus "[a]n examination of the debtor's entire financial situation and debt structure may be necessary to make this determination." *In re CLE Corp.*, 59 B.R. 579, 585 (N.D. Ga. 1986). Indeed, "[t]he cases that have considered this issue have rejected the contention that the generally-not-paying standard is a matter of simple mathematics requiring courts to establish a ratio of paid debts to unpaid liabilities." *Id.* In *In re Reed* the court explained that the "number, amount, and materiality of non-payment" must be "viewed in the context of the debtor's overall handling of its financial affairs." 11 B.R. at 760. "If the debtor is winding up his business or personal affairs, selling assets in a liquidating fashion, paying only nondischargeable or co-obligor debts, kiting checks, or otherwise is conducting his financial affairs in a manner not consistent with one operating in good faith and in the regular course of business, then the interpretation of nonpayment could be

10

quite different." *Id.*; *see also CLE Corp.*, 59 B.R. at 588.

20. At the hearing on April 8, 2015, this Court recognized that "context" may be relevant in showing "the particular debts that were not paid, and the extent to which those debts are significant for this business, and how large they are, and how long they have been delinquent and so on . . . ." Levinson Decl., Ex. B, at 56:8-15. Other courts have followed a similar path. *See, e.g.*, *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 779 F.2d 471, 475 (9th Cir. 1985) ("The court may examine the Debtor's overall handling of its affairs in evaluating whether to order relief. If the Debtor is conducting his financial affairs in a manner inconsistent with good faith and outside the ordinary course of business, it may affect the court's determination."); *CLE Corp.*, 59 B.R. at 588 (concluding that a debtor was generally not paying its debts where it failed to pay major obligations that would have caused it to run out of cash, but was paying operating expenses, accounts payable, and secured debt promptly, and, in some cases, earlier than required); *In re Fallon Luminous Prods. Corp.*, No. 09-35581, 2010 Bankr. LEXIS 248, at *14-16 (Bankr. E.D. Tenn. Jan. 20, 2010) (examining whether the debtor was using loan proceeds to pay operating expenses while failing to make interest payments to secured creditors).

21. In this case, the context for the Debtor's failure to pay certain debts is particularly salient. The Debtor has already acknowledged that it failed to pay $225 million of interest due to hundreds of Second Priority Noteholders in the weeks leading up to the involuntary petition, and it also appears that the Debtor failed to pay its obligation to the Hilton retirees for some time. Moreover, although the Debtor has attempted to justify its pre-bankruptcy transactions as efforts to extend debt maturities, meet interest obligations, reduce debt, generate cash, and enable growth, there is no doubt the transactions were well outside of the "regular course of business."

22. The documents responsive to Request Nos. 16-21 and 23 are "reasonably

calculated" to provide an appropriate context for the Debtor's missed payments. Indeed, the Debtor has itself put "context" into issue by citing *In re Reed* for the proposition that "commercial practice" explains or justifies its failure to make payment of interest when due under the 2008 Second Priority Notes or 2009 Second Priority Notes, or other debts that were unpaid as of the petition date. *See* Levinson Decl., Ex. B, at 52:4-13; *see also* ECF No. 78, at 8, ¶ 18.[9] And in evaluating the context of missed payments, courts specifically look at facts such as premature payment of other debts (Request No. 16), payment to or for the benefit of insiders (Request No. 17), transferring assets in a liquidating fashion (Request No. 19), or conducting business in a manner inconsistent with the regular course of business (Requests Nos. 18, 21, 23).

23. For example, Request No. 16 seeks documents regarding "the payment of any indebtedness of CEOC prior to its stated maturity date during the 180 days prior to the Petition Date." Levinson Decl., Ex. C, at 10. As in *CLE Corp.*, this information is relevant to show whether, in the months leading up to the bankruptcy, the Debtor was preferring certain creditors over others, which courts have found significant in assessing whether a debtor is generally paying its debts. *See* 59 B.R. at 588.

24. Similarly, Request No. 17 asks for documents regarding "the payment of any Intercompany Claim during the 180 days prior to the Petition Date," and Request No. 19 seeks documents regarding "any transfer of value from CEOC or any of its subsidiaries to any Insider

---

[9] To be clear, the Debtor is not entitled to seek discovery from the Petitioning Creditors regarding any alleged "commercial practice," given the plain language of the indentures and the Second Priority Notes providing that payments were due on December 15, 2014. *E.g.*, *Fallon Luminous Products*, No. 09-35581, 2010 Bankr. LEXIS 248, at *16 ("Section 303(h) does not require that its creditors make demand for payment, nor that the payment history be tested by an industry or customary standard. The question is whether its debts are being paid when due . . ."). Any documents necessary to provide "context" as to the Debtor's alleged reasons or justification for its failure to pay the interest when due would necessarily be in the Debtor's possession. This issue will be addressed further in the Petitioning Creditors' reply in support of its motion for protective order, to be filed May 20, 2015.

within 180 days of the Petition Date."[10] Levinson Decl., Ex. C, at 10.  Here again, these requests seek information that could be relevant to show that the Debtor was preferring certain creditors over others—namely, insiders and affiliates—in the months leading up to its bankruptcy.  *See Reed*, 11 B.R. at 760.  While the Petitioning Creditors have no intention to litigate the *validity* of the challenged transactions—and, indeed, have sent the Debtor a series of stipulations regarding the undisputed *facts* of the transactions—whether payments were made by the Debtor to affiliates at a time when it was not paying hundreds of holders of Second Priority Note debts is relevant to understanding the context and justification for the non-payments.

      25.     In addition to the above, Request No. 18 seeks documents regarding "(a) any plans for CEOC or any of its subsidiaries to seek relief under the Bankruptcy Code or any provision thereof, and (b) any authorization by any Board to prepare for the possible or actual commencement of a bankruptcy proceeding."  Levinson Decl., Ex. C, at 10.  This request also may lead to the discovery of admissible context evidence because payments deliberately avoided as part of an effort to pursue a restructuring through bankruptcy may carry different significance with respect to the Petitioning Creditors' decision to protect their rights through the statutory remedy provided them by Section 303.

      26.     Request No. 20, as revised by Petitioning Creditors, seeks "All Documents provided to, created by, or received from the Board of Directors of CEOC since January 1, 2014, including without limitation all Communications among any of the members of the Board of Directors of CEOC and any officer or employee of CEOC or any of its subsidiaries, Regarding

---

[10] "Intercompany Claim" is defined in the Petitioning Creditors' request for production as "(a) any Claim asserted against CEOC or any of its subsidiaries by an entity included in Caesars, including without limitation Claims under the Intercompany Credit Agreement and the Global Intercompany Note and (b) any Claim asserted by CEOC or any of its subsidiaries against any other entity included in Caesars, including without limitation Claims under the Intercompany Credit Agreement and the Global Intercompany Note."  Levinson Decl., Ex. C, at 5. "Insider" has the meaning set forth in the Bankruptcy Code.  *Id.*

payment or non-payment of debts or obligations." Levinson Decl., Ex. C, E. Similarly, Request No. 21 seeks documents regarding "compliance certificates, officers certificates, letters from financial advisors, or similar certificates or letters issued or delivered by CEOC to any third party pursuant to any debt instrument, indenture, credit agreement, mortgage, collateral agreement, pledge agreement, or other contract or instrument." Levinson Decl., Ex. C at 11. Such documents could lead to the discovery of admissible evidence by clarifying the circumstances under which the Debtor elected not to pay interest to holders of the Second Priority Notes or not to pay other debts and obligations.

27. Finally, Request No. 23 seeks documents "setting forth the calendars, appointment books, or similar materials sufficient to show the daily schedules of any Officer or Director for the 180 days prior to the Petition Date." Levinson Decl., Ex. C, at 11. As above, this request could lead to the production of admissible evidence because it could show that the officers were not operating the Debtor's business in the ordinary course, and were instead planning a bankruptcy case and/or other asset transfers in the months leading up to the petition.

28. Accordingly, the Petitioning Creditors are entitled to the requested discovery in order to make a showing of the context for the Debtor's non-payments.

### III. THE COURT SHOULD COMPEL PRODUCTION OF A PRIVILEGE LOG

29. The Petitioning Creditors' Request No. 28 sought production of a privilege log for any documents withheld by the Debtor on grounds of privilege. Levinson Decl., Ex. C, at 11. The Debtor, however, objected to this request on the ground that it sought "information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." Levinson Decl., Ex. D, at 17. During subsequent communications, the Debtor declined to provide a privilege log, primarily because of the short time-frame in which to complete discovery, the fact that many documents were likely to be withheld as privileged, and the burden

14

on the Debtor that production of a privilege log would create.

30.  The fact that the provision of a privilege log is burdensome or that the volume of entries on such a log may be large is not, by itself, sufficient to obviate CEOC's obligation to provide one.  Federal Rule 26(b)(5), made applicable by Bankruptcy Rules 7026(b)(5) and 9014, specifically requires a party claiming privilege to "describe the nature of the documents, communications, or tangible things not produced or disclosed . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." The production of a privilege log is thus a requirement, not an option.  *See, e.g. Rawat v. Navistar Int'l Corp.*, No. 08 C 4305, 2011 WL 3876957, at *3 (N.D. Ill. Sept. 1, 2011) ("Once litigation begins, Fed. R. Civ. P. 26(b)(5) requires a party served with discovery to provide a privilege log concerning relevant documents it believes are responsive but protected by a privilege."); *Odongo v. City of Indianapolis*, No. 1:14-CV-00710-TWP-MJ, 2015 WL 420110, at *2 (S.D. Ind. Jan. 30, 2015) ("Defendant's general objection refusing to present such a privilege log as 'unreasonable and unduly burdensome' is contrary to law and was overruled at oral argument.") (citations and internal quotation marks omitted).

31.  Earlier today, the Debtor indicated that it is willing to provide a privilege log as to some, but not all, of the categories of documents to be produced.  Levinson Decl., Ex. H.  The Petitioning Creditors will continue to meet and confer with the Debtor but, in the absence of any agreement by the Petitioning Creditors, this Court should compel the Debtor to produce a log in accordance with the Federal Rules and Bankruptcy Rules.

## CONCLUSION

32.  For the reasons set forth above, this Court should grant the motion.

15

Dated: May 14, 2015
      Chicago, Illinois

Respectfully submitted,

    */s/ Timothy W. Hoffmann*
Timothy Hoffmann  (No. 6289756)
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
Telephone:   (312) 782-3939
Facsimile:    (312) 782-8585
thoffmann@jonesday.com

-and-

Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
JONES DAY
555 South Flower Street
50th Floor
Los Angeles, California  90071
Telephone:   (213) 489-3939
Facsimile:    (213) 243-2539

Counsel for Appaloosa Investment Limited Partnership I, OCM Opportunities Fund VI, L.P. and Special Value Expansion Fund, LLC

16