**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-03193 (ABG) |
| COMPANY, INC.,[1] | ) |
| | ) **Re: Docket Nos. 81, 82** |
| Alleged Debtor. | ) |
| | ) **Presentment Date: May 20, 2015 at** |
| | ) **9:30 a.m. CDT** |

**ALLEGED DEBTOR'S OBJECTION TO PETITIONING CREDITORS'**
**MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Alleged Debtor Caesars Entertainment Operating Company, Inc. ("Debtor") submits this

objection to *Petitioning Creditors' Motion to Compel Production of Documents* (the "Motion").

In support of its objection, Debtor states as follows:

**INTRODUCTION**

1.      Though Petitioning Creditors have the burden of demonstrating that Debtor was

not generally paying its debts as they came due, they filed their involuntary petition on the basis

of a single missed interest payment.  Recognizing that a single missed interest payment could not

satisfy the "generally not paying debts" standard for a company with $18 billion of funded debt,

Petitioning Creditors have now launched a massive fishing expedition in the hopes of salvaging

their petition and avoiding damages.

2.      Thus, Petitioning Creditors have requested that Debtor produce (a) the underlying

"source documents" (*i.e.,* invoices and payment information) demonstrating all of Debtor's debts

for the 180 days preceding the petition date; and (b) all documents regarding Debtor's "good

---

[1] The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification
number are 1623.

faith" conduct of its affairs for the six to twelve months preceding the petition date, including documents relating to the disputed transactions. These requests run afoul of the direction provided by the Court, which explicitly stated that any discovery relating to the involuntary proceeding would be limited and would not require an examination into the particulars of the disputed transactions.

3.      Ignoring the Court's guidance and rejecting all of Debtor's offers to reasonably compromise and narrow the requests at issue, Petitioning Creditors filed a motion, which, if granted, would impose a massive burden on Debtor. As described below and in the Declaration of Randall Eisenberg filed concurrently herewith, it would take Debtor more than ***3,600 hours*** to review more than 39,000 potentially responsive invoices and more than 13,000 payments records in order to provide all of the underlying source documents Petitioning Creditors seek. Petitioning Creditors' refusal to compromise is particularly unjustified given that Debtor has agreed to provide from its ordinary course records all of the information required to identify all of Debtor's debts, when those debts were paid, and, if not paid, how long they are overdue—*i.e.,* the same type of information contained in the underlying source documents.

4.      Debtor's willingness to cooperate with discovery stands in stark contrast to Petitioning Creditors' attempts to stonewall Debtor's own narrow discovery requests. Discovery is not a one-way street where Petitioning Creditors are entitled to any document—no matter how irrelevant or burdensome—while Debtor is entitled to almost nothing. This Court should reject Petitioning Creditors' attempt to impose a staggering burden on Debtor with the hope that Debtor's inability to comply provides some post-hac justification for their unfounded (and bad faith) petition.

**BACKGROUND**

5.     On February 2, 2015, Debtor moved to suspend proceedings on the involuntary petition on the grounds that, *inter alia*, it would require the parties "to litigate whether certain transactions that occurred during 2014 were done in 'good faith and in the regular course of business.'" (*Mot. to Suspend Proceedings*, [Dkt. No. 7], at ¶ 9.)  The Court, however, was "not convinced that permitting the adjudication of the involuntary case will place any significant burden on the debtors" because there was "no reason why the so-called disputed transactions should even come up." (Ex. A, Mar. 25, 2015 Hr'g Tr., at 120:10-12, 120:25.)  Consequently, the Court concluded that "the nightmare of endless discovery that the debtors try to paint is not a concern." (*Id*. at 121:6-7.)  According to the Court, the core inquiry—whether Debtor was generally paying its debts—was a "straightforward" issue that could be "resolved fairly quickly," and "[a]ny discovery would be limited." (*Id*. at 120:13-121:2.)

6.     At an April 8, 2015 status hearing, the Court reiterated that, to the extent the disputed transactions are relevant, "it would be the fact of the transactions and not people's characterization of them as innocent or evil." (Ex. B, Apr. 8, 2015 Hr'g Tr., at 56:16-18.)  The Court further noted that "[t]o suggest that the good faith of the debtors' operation is an issue is, I think, a misreading of *Reed*" and "[t]he idea is to have a context for the evidence that is really critical, and that is whether the debtor is actually paying the debts or not." (*Id*. at 54:4-6, 55:5-7.)

7.     Notwithstanding the Court's observations on the proper scope and breadth of discovery, Petitioning Creditors served wide-ranging requests for production (the "Requests") that far exceeded the Court's guidance.  As to documents relating to Debtor's payment of its debts, Petitioning Creditors seek every underlying invoice evidencing payment due dates and the date that payment was actually made for the 180 days preceding the petition date.  (Ex. C,

Requests No. 8.)  Despite the Court's guidance, Petitioning Creditors also requested documents

relating to the disputed transactions and Debtor's good faith in the operation of its business over

the last six to twelve months, including (a) <u>all</u> documents setting forth the calendars or

appointment books of any officer or director of Debtor or its subsidiaries and (b) <u>all</u> documents

regarding (i) any transfer of value from Debtor to any insiders; (ii) any plans for Debtor or any of

its subsidiaries to seek relief under the Bankruptcy Code; and (c) the payment of indebtedness of

Debtor prior to its stated maturity date.  (Ex. C, Requests Nos. 16, 18-19, 23.)

8.     Debtor agreed to provide documents in response to 19 of the 29 Requests,

including documents sufficient to show the number and amount of debts that Debtor was, and

was not, paying as of the petition date.  (Ex. D, Debtor's Resp. and Obj. to Requests.)  Debtor

objected to providing (a) "all documents evidencing any and all invoices, requests for payment,

purchase orders, other payment demands, copies of checks, confirmations of wire transfers,

records of automated clearing house transfers, or other forms of transfers;" and (b) all documents

relating to the disputed transactions and Debtor's good faith operation of its business.  (*Id*.; *see

also* Ex. E, May 12, 2015 letter from W. Arnault to S. Levinson, at 1.)

9.     During two meet and confers, Debtor offered several compromises intended to

reduce the burden of responding to the Requests while still providing Petitioning Creditors with

complete information necessary to conduct the critical inquiry of whether CEOC was generally

paying its debts as they came due.  (*See* Ex. E, at 1.)  For example, Debtor offered to provide

invoice data, corresponding disbursement information, and accounts payable aging reports that

contained the underlying source data from the invoices and payments—*i.e.,* ordinary course

information taken directly from the Debtor's systems.  Debtor also offered to perform a sampling

whereby it would produce a subset of the invoices and corresponding payments.   (*Id*.)

4

Petitioning Creditors refused to compromise.  (*See* Ex. F, May 13, 2015 letter from S. Levinson

to W. Arnault, at 1.)

**ARGUMENT**

**I.    THE COLLECTION OF ALL OF THE UNDERLYING INVOICES AND PAYMENT INFORMATION IS MASSIVELY BURDENSOME AND WOULD TAKE MORE THAN 3,600 HOURS (REQUESTS NOS. 8-12, 27).**

10.    Petitioning Creditors have moved to compel the production of Requests Nos. 8-12

and 27.  (Mot. ¶ 6.)  As written—and confirmed by Petitioning Creditors in its Motion and the

parties' meet and confers—satisfying these requests would require Debtor to produce the

underlying source documents evidencing each of the Debtor's debts and their corresponding

payment (*i.e.*, "the actual invoices, requests for payment, purchase orders, agreements, and other

payment demands received by the Debtor and evidencing any payment made by the Debtor")

over a six-month period.  (*Id.* ¶ 9.)

11.    Though the scope of discovery is generally broad, a party does not have *carte*

*blanche* to serve overly broad and unduly burdensome requests.  *See Am. Family Mut. Ins. Co. v.*

*Roth*, No. 05 C 3839, 2010 WL 3397362, at \*2 (N.D. Ill. Aug. 25, 2010) ("Parties are entitled to

a reasonable opportunity to investigate the facts—and no more.").  Instead, the value of the

requested discovery must be weighed against the substantial burden of producing it and the scope

of discovery "must" be limited under any of the following circumstances:

> i.    the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> ii.    the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> iii.    the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

12.     As set forth in the Declaration of Debtor's Chief Restructuring Officer, Randall

Eisenberg, the scope of Petitioning Creditors' Requests are the type that "must" be limited under

Rule 26(b)(2)(C).  If Debtor was ordered to provide only the invoices and payment information,

it would take more than 3,600 hours to collect those documents and match up the payments and

invoices.  (Decl. of R. Eisenberg, ¶ 15.)  Even if Debtor re-assigned *10* of its employees to focus

exclusively on gathering documents responsive to Petitioning Creditors—notwithstanding the

significant strain this would place on Debtor's business generally—it would still take Debtor

more than two months to collect those documents.

13.     Debtor and its debtor affiliates ("Debtors") have twelve different systems that

house invoices and five different methods that it utilizes to pay those invoices (*i.e.,* wires,

property checks, corporate checks, automated clearing houses ("ACH"), and virtual P-Cards).

(*Id*. ¶¶ 10-11.)  Most of the systems do not segregate the invoices and payments by entity.  (*Id*.

¶ 14.)  Most of the systems are also not automated in such a way that Debtor could simply run an

electronic search to retrieve the Debtor-specific invoices and payments.  (*Id*.)  Put differently, all

of the invoice and payment documents for multiple Debtors are commingled in the various

systems and databases.  (*Id*.)  Thus, the collection of these documents is not, as Petitioning

Creditors suggest, as simple as downloading the requested documents from the 17 different

sources of invoice and payment documents.  (*Id*.)

14.     In reality, Debtor would need to design a process whereby it would be able to

retrieve the Debtor-specific invoices and payments from the much larger universe of invoices

and payments stored in its various systems and databases.  (*Id*.)  For example, Debtors' Cass

system manages the collection, auditing, and payment of telecommunications bills.  (*Id*. ¶ 32.)

6

Debtor, on behalf of the other Debtors, provides one payment to Cass; Cass then divides up that payment and passes it on to the individual telecommunications companies. (*Id*. ¶¶ 32-33.) The invoice copies are retained on Cass's system, where they are not segregated by entity. (*Id*. ¶ 32.)

15.    Upon review, there are approximately 1,976 invoices in the Cass system for the 180 days preceding the petition date. (*Id*. ¶ 33.) To determine which invoices are Debtor-specific, Debtor's employees would first need to download the individual invoices copies from the Cass system. (*Id*.) Debtor would then have to manually review each of the invoices to identify and retrieve the Debtor-specific invoices. (*Id*.) Debtor estimates that it would be able to review 60 invoices per hour. (*Id*.) At that rate, Debtor estimates that it would take approximately 33 hours to identify and retrieve the Debtor-specific invoices that are in the Cass system. (*Id*.)

16.    A similar process would need to be designed and implemented for the 11 other systems, which, in total, house approximately 37,000 other invoices. (*Id*. ¶¶ 17-49.) The number of invoices that Debtor could review per hour varies by system. (*Id*.) Retrieving the Debtor-specific invoices in these other systems would take almost 1,100 hours combined. (*Id*.)

17.    Retrieving the Debtor-specific payments presents similar complexities. For example, Debtor makes the majority of its payments through a corporate check disbursement account. (*Id*. ¶ 59.) The proof of payment that Petitioning Creditors have requested would be the cleared check image, which is housed by Wells Fargo. (*Id*.)

18.    A review of Debtor's records reveals that it issued approximately 9,884 payments by corporate check in the 180 days preceding the petition date. (*Id*. ¶ 60.) To retrieve the relevant payment documentation, Debtor would need to:

(a) Retrieve all copies of cleared checks;

(b) Organize the cleared checks to identify only Debtor-appropriate checks;

(c) Save Debtor-specific cleared check images.

(*Id*.)

19.    Debtor estimates that it would be able to review and retrieve 20 check images per hour.  (*Id*. ¶ 61.)  At that rate, Debtor would be able to review and retrieve the 9,884 check images payments in approximately 494 hours.  (*Id*.)

20.    A similar process would need to be designed and implemented for the four other payment methods, which issued 3,935 payments in the 180 days preceding the petition date.  (*Id*. ¶¶ 50-67.)  The number of invoices that Debtor could review per hour varies by system.  (*Id*.) Retrieving the Debtor-specific payments for these four other methods would take approximately 632 hours.  (*Id*.)

21.    Retrieving the invoice and payment information would not, however, reveal which payments correspond to which invoices.  (*Id*. ¶ 68.)  To match up the payments and invoices, Debtor would need to perform an additional process.  (*Id*.)  First, Debtor would need to individually extract all of the payments and invoices.  (*Id*. ¶ 69.)  Second, Debtor would need to manually match the payment images with the corresponding invoice images and then save the matches to a distinct folder.  (*Id*.)  Debtor estimates that it would take approximately five minutes to manually match each of the payments to the corresponding invoice.  (*Id*.)  At that rate, it would take approximately 1,449 hours for Debtor to match all of the payments and invoices (inclusive of the additional time required to manually extract all of the individual invoices).  (*Id*. ¶¶ 69-70.)

22.    Given the enormous burden Debtor faces in responding to Petitioning Creditors' requests, Debtor offered to provide the same information in a form that was far less burdensome.

*See* Fed. R. Civ. P. 26(b)(2)(C) (court must limit discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."). For example, Debtor offered to provide its ordinary course monthly accounts payable aging reports for the 180 days preceding the petition date. (Ex. E, at 1.) Petitioning Creditors rejected this compromise, ostensibly on the grounds that Debtor's schedules of assets and liabilities contain disclaimers regarding the accuracy of its records—even though these disclaimers are general boilerplate language that most debtors include in their schedules of assets and liabilities. (Mot. ¶ 13.) Any aging reports produced by Debtor would, however, reflect invoice and payment information taken directly from Debtor's systems and relied upon by Debtor in its day-to-day operations. As a result, Petitioning Creditors would not only receive the same "source" information they claim to need, but would also be able to test the data contained in the aging reports by reviewing the underlying invoice data pulled directly from Debtor's systems and contained in the report.

23.     Petitioning Creditors also rejected Debtor's offer to provide a sampling of any invoices and payments that Petitioning Creditors requested (Ex. F at 2), even though this is what any auditor would do to test the accuracy of a company's books and records. (Decl. of R. Eisenberg, ¶ 7). Any sampling approach could be tailored to meet Petitioning Creditors' needs. Significantly, a sampling approach would allow Petitioning Creditors to test the accuracy of Debtor's aging reports and obtain certain of the source documents they claim to need *without* imposing such a massive burden on the Debtor.

24.     In their Motion, Petitioning Creditors ignore the enormous burden that Petitioning Creditors' requests would impose on Debtor and Debtor's offer of less burdensome alternatives, and instead claim that "[c]ourts *in other contexts* have rejected claims that production of invoices

9

would be unduly burdensome." (Mot. ¶ 11 (emphasis added).) Petitioning Creditors are correct

that the cases they cite occurred "in other contexts" and thus are readily distinguishable from the

situation here where they seek to require the production of *enormous volumes* of invoices and

payment documentation. *See, e.g., Crable v. State Farm Mut. Auto Ins. Co.*, No. 5:10-cv-402-

OC-37 TBS, 2011 WL 5525361, at *7 (M.D. Fla. Nov. 14, 2011) (invoices important to show

the nature and extent of the relationship between a law firm and a doctor to whom the law firm

referred clients; testimony, if true, suggested it would not be "unduly burdensome" for invoices

to be produced, and invoices limited to **176 clients** referred to doctor by law firm) (emphasis

added); *Nat'l Sur. Corp. v. Dustex Corp., et al.*, No. C13-2004, 2014 WL 46541, at *2 (N.D.

Iowa Jan. 6, 2014) (law firm asked to produce one client's invoices, admitted it "did not know if

they consisted of 20 pages or 200 pages"). The parties in Petitioning Creditors' cases did not put

forth specific evidence regarding the nature and extent of the burden, nor did they present any

reasonable alternatives. *See, e.g., Aho v. AmeriCredit Fin. Servs., Inc.*, No. 10 cv 1373-DMS

(BLM), 2012 WL 124794, at *6 (S.D. Cal. Jan. 13, 2012) (defendant did not "describe in detail

precisely why producing" invoices would be burdensome, and "neither party suggest[ed] a more

convenient method of obtaining this information"). Debtor has done both. The compromises

Debtors have offered will satisfy any legitimate need for discovery Petitioning Creditors have.

25.     Indeed, courts have relied upon accounts payable aging reports or other ordinary

course business records in assessing whether a debtor was generally not paying its debts,

independently from the consideration of any physical invoices. *See, e.g., In re W. Side Cmty.

Hosp., Inc.*, 112 B.R. 243, 257 (Bankr. N.D. Ill. 1990) ("The aging report, referred to above,

along with the Accounts Payable invoice registrar…shows that West Side was not paying its

debts as they became due."); *In re Apollo Health St., Inc.*, No. 11-22970 NLW, 2011 WL

1884182, at *8 (Bankr. D.N.J. May 18, 2011) (considering alleged debtor's accounts payable

aging and testimony relating thereto).

26.     Recognizing that they filed their involuntary petition on the basis of one missed

interest payment, Petitioning Creditors are now hoping they can salvage their involuntary

petition by bludgeoning Debtor into submission with incredibly onerous discovery aimed at

obtaining some post-hac justification for their ill-conceived action.  Indeed, the broad disconnect

between what Petitioning Creditors originally alleged and what they are now trying to prove lays

bare their bad faith.  Petitioning Creditors' efforts should be denied and the parties should

proceed in accordance with the Court's initial guidance that "[a]ny discovery would be limited."

(Ex. A, Mar. 25, 2015 Hr'g Tr., at 120:13-121:8.)

## II.     PETITIONING CREDITORS' REQUESTS SEEKING DOCUMENTS FOR "CONTEXT" ARE IRRELEVANT, OVERLY BROAD, AND UNDULY BURDENSOME.

### A.     Petitioning Creditors' Requests Relating to the Disputed Transactions and Debtor's Good Faith Are Not Relevant Under the Generally Not Paying Debts Standard.

27.     Despite the Court's guidance, Petitioning Creditors claim that Requests Nos. 16-

21 and 23 are "aimed at establishing a context for Debtor's missed payments."  (Mot. ¶ 17.)  But

these requests are "aimed" on their face at obtaining documents relating to the disputed

transactions and whether Debtor was conducting its business in good faith.  For example, these

requests seek *all* documents regarding (a) any transfer of value from Debtor to any insider; (b)

Debtor's payment of its indebtedness <u>prior</u> to its stated maturity date; (c) the payment of any

intercompany claim; (d) Debtor's plans to seek relief under the Bankruptcy Code; and (e)

compliance certificates provided to Debtor pursuant to any contract or instrument.  (Requests

Nos. 16-19, 21.)  These requests also seek all documents provided to the Board of Directors[2]

regarding payment or nonpayment of debts and all documents setting forth the calendars and

appointment books of any of Debtor's officers or directors.  (Requests Nos. 20, 23.)

28.     Though the Court noted that evidence providing "context" for Debtor's payments

of its debt "might matter," it stated that "I don't think good faith, per se, is something that we're

going to get into."  (Ex. B, Apr. 8, 2015 Hr'g Tr. at 57:7-10; s*ee also* Ex. A, Mar. 25, 2015 Hr'g

Tr., at 120:25-121:2 ("I am not convinced and see no reason why the so-called disputed

transactions should even come up.").)  This view is consistent with *Ginsburg and Martin on*

*Bankruptcy*, which the Court quoted at the April 8, 2015 hearing:

> Some courts have considered evidence of the debtor's good faith in its dealings
> with its creditors to see whether a debtor was generally in default, and have given
> weight to such facts as loans or payments to insiders.  This subjective approach is
> questionable.  That the debtor has made fraudulent conveyances or preferential
> payments is no longer a ground for involuntary bankruptcy.  The Bankruptcy
> Code takes a more objective approach and does not look to subjective evidence of
> the debtor's conduct as a ground for involuntary bankruptcy.  It is hard to see
> what the question of the good faith of the debtor has to do with the essentially
> factual determination of whether the debtor is generally in default on current
> obligations.  Either the debtor is generally in default or it is not.  *Why* the debtor is
> or is not in default is irrelevant.  In fact, the debtor's *ability* to pay should be
> irrelevant.  The simple question is one of fact—is the debtor generally paying
> debts as they come due?

Ginsburg & Martin on Bankr. § 2.03 (emphasis in original).

29.     Thus, Petitioning Creditors' requests for documents relating to, *inter alia*,

"payment[s] to or for the benefit of insiders" and whether Debtor was "transferring assets in a

liquidating fashion" or "conducting business in a manner inconsistent with the regular course of

---

2   Petitioning Creditors defined "Board of Directors" to include "any attorney, banker, financial
    advisor, investment banker, or other agent acting on behalf of such Board."  (Ex. C, Requests
    at 2.)

business" (Mot. ¶ 22) seek the exact types of information that Ginsberg and Martin identified as irrelevant.

30.     These requests go far beyond the narrow issues of whether Debtor was generally paying its debts, the materiality of any unpaid debts, and the length of time any unpaid debts were overdue. (Ex. B, Apr. 8, 2015 Hr'g Tr. at 56:8-15.) Instead, they relate to "subjective evidence of debtor's conduct," which are the very types of "good faith" requests that the Court stated were not relevant. As such, Petitioning Creditors' Motion is nothing more than an attempt to re-litigate the Court's ruling on Debtor's Motion to Suspend. Petitioning Creditors' veiled attempt at a motion for reconsideration should be rejected, and its efforts to compel the production of these documents should be denied.[3]

**B.      Even if the Occurrence of the Disputed Transactions were Relevant, Petitioning Creditors' Request that Debtor Produce <u>All</u> Documents Regarding these Transactions and the Good Faith Conduct of its Affairs is Overly Broad and Unduly Burdensome.**

31.     As noted during the April 8 hearing, the Court questioned the relevance of the disputed transactions and suggested, at most, "it would be the fact of the transactions and not people's characterizations of them as innocent or evil" that might be relevant. (*Id.* at 56:16-18.) To the extent deemed relevant, Debtor has expressed a willingness to stipulate to the occurrence of the disputed transactions and the admissibility of certain documents describing those transactions.

32.     Notably though, Petitioning Creditors' requests are not limited to obtaining documents demonstrating the occurrence of the disputed transactions. In fact, the scope of the

---

[3]   In contrast to Petitioning Creditors' "context" requests, Debtor's "commercial practice" requests regarding the interpretation of the indentures and the application of a 30-day grace period relate to the duration and materiality of non-payment, and thus go the core question of general default. Petitioning Creditors' "context" requests instead relate to Debtor's subjective good faith under the fourth *Reed* factor and are wholly irrelevant.

Requests at issue is conspicuously absent from Petitioning Creditors' Motion.  As noted above, however, Petitioning Creditors have requested *all documents regarding* (a) any transfer of value of Debtor or any of subsidiaries to any insider; (b) the payment of any Intercompany Claim; (c) any plans for Debtor to seek bankruptcy; (d) the payment of any indebtedness prior to the stated maturity date; and (e) compliance certificates issued pursuant to any contracts.  (Ex. C, Requests Nos. 16-19, 21.)

33.     To obtain these documents (none of which is relevant), Debtor would need to undertake the substantial task of performing an electronic collection of *all* potentially-responsive emails and documents, applying search terms to that data set, and then reviewing any potentially-responsive documents for responsiveness and privilege.  The burden of doing so outweighs any limited relevance of these documents—particularly where, as here, Debtor is willing to enter into a stipulation regarding the existence of the disputed transactions if they are deemed to have any bearing on the general default inquiry.  Consequently, Petitioning Creditors' attempt to compel the production of Requests Nos. 16-21 and 23 should also be denied on the grounds that they are irrelevant and unduly burdensome.

## III.     DEBTOR SHOULD NOT HAVE TO PROVIDE A PRIVILEGE LOG FOR OVERBROAD REQUESTS.

34.     Petitioning Creditors have also moved to compel the production of "[a]ll Documents Regarding any privilege log."  (Mot. ¶¶ 29-31.)  Putting aside the ambiguity of this request—it is not clear, for example, what is meant by all documents *regarding any* privilege log—Petitioning Creditors cannot issue extremely overbroad requests and then insist that any privileged documents within the scope of those overly broad requests be logged.

35.     To alleviate the burden of producing a privilege log, Debtor identified the categories of documents that it would likely withhold on privilege grounds: (1) documents

regarding the August note purchase transaction; (2) documents regarding Debtor's plans and decision to file for bankruptcy; (3) communications among counsel and the Board of Directors regarding the payment or nonpayment of debts or obligations; (4) documents relating to the Hilton claim; and (5) documents regarding the decision to make the December 15, 2014 interest payment. (Ex. E, at 2). In response, Petitioning Creditors asked that Debtor log documents in all categories except 1 (the August transaction). (Ex. F, at 3.)

36.     As Debtor explained, it is willing to work with Petitioning Creditors on this issue, but providing a privilege log for categories 2 and 3 was unduly burdensome. (Ex. G, May 14, 2015 letter from W. Arnault to S. Levinson, at 2.) For example, documents regarding Debtor's plans and decisions to file for bankruptcy would encompass all of the work that Debtor did pre-petition. (*Id.*) Communications with the Board of Directors was similarly overbroad and unduly burdensome given that Board of Directors is defined to include "any attorney, banker, financial advisor, investment banker, or other agent acting on behalf of such Board." (Ex. C, at 2.)

37.     Furthermore, as explained above, these two categories are not relevant to the issues in the involuntary proceeding. As such, Debtor should not have to provide a privilege log identifying these documents.

## CONCLUSION

38.     For the foregoing reasons, Debtor respectfully requests that the Court deny the Motion in its entirety.

*[Remainder of Page Intentionally Left Blank]*

Dated:  May 19, 2015
Chicago, Illinois

*/s/ Jeffrey J. Zeiger, P.C.*

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Paul M. Basta, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Counsel to CEOC*

16